**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF : **ONE BLACK IPHONE, ONE APPLE LAPTOP,** AND **ONE DVR NIGHT OWL SECURITY SYSTEM WITH SERIAL NUMBER:YWV1U9U0HRBD,** CURRENTLY LOCATED AT **2600 THOUSAND OAKS BLVD, SUITE 2300, MEMPHIS, TN 38118** | Case No. ___23-SW-284___ <br><br> **FILED UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Kyle Williams, a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearm, and Explosives and have been since December 2021. I am federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been employed with ATF since 2021.  I have a bachelor's degree from Middle Tennessee State University with a Criminal Justice major. Prior to working for the ATF, I was employed as a police officer with the Metropolitan Nashville Police Department from June 2012 through April 2021. During my employment with the Metropolitan Nashville Police Department, I spent approximately 7 years in an investigative capacity. During the course of my career, I have

been involved in a variety of investigation ranging from simple possession of narcotics and firearms to complex conspiracies. Additionally, during my law enforcement career I have participated in numerous search and arrest warrants. I have conducted investigation of unlawful drug distribution and importation in violation of 21 U.S.C. § 841(a)(1) and firearms related offenses in violation of 18 U.S.C. § 922(g) and 924(c). I have also participated in wire and physical surveillance, executions of search warrants, debriefing of informants, and reviews of taped conversations and transaction records. Through my training, education, an experience, I have become familiar with the manner in which illegal drugs and other prohibited items are transported, stored, distributed, and methods of payments for such items. I have also participated in and been lead detective in homicide investigations. The investigations include overdose deaths, murders, and accidental deaths.

3.      Throughout my training as a Special Agent with the ATF, I was trained to conduct physical surveillance, interview sources of information and defendants, serve and review telephone subpoenas, serve search warrants and arrest warrants, investigate firearms and narcotics trafficking, National Firearm Act (NFA) violations, Hobbs Act violations, undercover firearms and narcotics investigations, and the interception of wire communication. I routinely refer to and utilize these laws and regulations during the course of my official duties. I am currently assigned to ATF Memphis Group II. My duties include the investigation of violations of federal firearms laws and regulation occurring within the Western District of Tennessee.

4.      I have participated in the investigation summarized in this affidavit concerning violations of 18 U.S.C. §§ 922(g).  I have received information about matters relevant to this investigation from, among other sources, conversations with and reports by other ATF Special Agents, Memphis Police Officers, Chattanooga Police Officers, and Metropolitan Nashville

Police Officers.  I am thoroughly familiar with the information contained in this affidavit, either through personal investigation or through communications with other agents and law enforcement investigators who have interviewed individuals or personally have obtained information, which they have in turn reported to me.  On the basis of this familiarity, and on the basis of other information which I have reviewed and determined to be reliable, I allege the facts recited below.

5.      Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish the necessary foundation in order to obtain the particular warrant at hand.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6.      The **DEVICES** to be searched are the following: **ONE BLACK IPHONE (DEVICE 1); ONE SILVER APPLE LAPTOP (DEVICE 2);** and **ONE DVR NIGHT OWL SECURITY SYSTEM WITH SERIAL NUMBER: YWV1U9U0HRBD (DEVICE 3),** hereinafter the "**DEVICES**."  The **DEVICES** are currently located at 2600 Thousand Oaks Blvd, Suite 2300, Memphis, Tennessee 38118.

7.      The applied-for warrant would authorize the forensic examination of the **DEVICES** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

8.      On September 28, 2021, **ECHOLS** was arrested by Memphis Police Department (MPD) following a traffic stop conducted for reckless driving. When **ECHOLS** was detained, Lt. Acred of MPD smelled a heavy odor of marijuana on **ECHOLS'** person. Due to the odor of marijuana, MPD officer O'Brien searched **ECHOLS'** vehicle. During the search, a Glock, .40 caliber pistol was located in the vehicle. The Glock handgun was affixed with a machinegun conversion device (MCD), also known as a "Glock Switch." The Glock firearm had one chambered round of ammunition and 11 additional rounds of ammunition in the firearm's magazine. Located in the center console of the vehicle was 4.7 grams of marijuana. The marijuana field tested positive as marijuana. SA Mark Jordan conducted a field function test on the Glock firearm affixed with the MCD, and the field function test showed the firearm functioned as if the Glock firearm was fully automatic. SA Mark Jordan also conducted a recorded interview with **ECHOLS**. **ECHOLS** was read his *Miranda* rights and waiver by SA Jordan, and **ECHOLS** agreed to speak to SA Jordan without a lawyer present. Additionally, **ECHOLS** signed a MPD rights waiver form at the conclusion of the interview. During the interview, **ECHOLS** admitted he was currently under the influence of marijuana. **ECHOLS** told SA Jordan he obtained the firearm at a gun show in Mississippi. **ECHOLS** traded a firearm and 400 dollars for the Glock. **ECHOLS** knew the firearm to be fully automatic due to him firing the firearm at a relative's house in Mississippi. Following the interview, MPD arrested **ECHOLS** and charged **ECHOLS** with the following: possession of a handgun while under the influence,

prohibited weapon to wit: machinegun, possession of a controlled substance: marijuana, drag racing, and reckless driving.

9.      On December 21, 2021, **ECHOLS** was arrested by Shelby County Sheriff's Office (SCSO). **ECHOLS** was in possession of a Glock, 9MM caliber pistol, a Romarm/Cugir 7.62X39MM caliber rifle, and approximately 5.56 pounds of marijuana. A rights waiver form and interview were completed following **ECHOLS'** arrest. During the interview, **ECHOLS** claimed ownership of both firearms and admitted to selling narcotics for financial gain. At the time of the December 21, 2021, arrest, **ECHOLS** was out on bond for the September 28, 2021, arrest. On May 26, 2022, under Shelby County case number C22-02089, **ECHOLS** was sentenced to judicial diversion for the charge of possession of marijuana with the intent to deliver, which is set to expire on May 26, 2023. The firearms charges were dismissed.

10.     ATF SA Bullock reviewed **ECHOLS'** jail calls following **ECHOLS'** September 28, 2021, and December 21, 2021, arrests. During a call dated, December 22, 2021, **ECHOLS** made a call to phone number 901-314-1623. During the phone call, **ECHOLS** stated the marijuana he had on his person during the December 21, 2021, arrest was to be sold to an unknown person.

11.     On August 22, 2022, SA Williams received a report of examination from ATF's Firearm Technology Criminal Brach. The report stated the Glock, .40 caliber pistol recovered

during **ECHOLS'** September 28, 2021, arrest, was a machinegun in violation of **26 U.S.C. §§ 5861(b) and 5861(d)**.

12. On October 13, 2022, SA Williams reviewed National Integrated Ballistic Network (NIBIN) leads associated with firearms **ECHOLS** possessed during his arrests on September 29, 2021, and December 21, 2021. The NIBIN leads are as follows:

a. The fully automatic Glock firearm **ECHOLS** was in possession of on September 28, 2021, had one NIBIN connection. The test fires of the firearm preliminary matched spent shell casings from an August 29, 2021, shooting. The time between **ECHOLS** being caught with the firearm and the shooting was 30 days.

b. The Mini Draco firearm that **ECHOLS** possessed on his December 21, 2021, arrest had two NIBIN connections. The first NIBIN connection was on September 13, 2021, where 59 shell casing were recovered, and the second incident was on October 4, 2021. Additionally, the original purchaser of this firearm was the subject of an ATF investigation in Mobile, Alabama on a suspect charged with dealing firearms without a license.

c. The Glock firearm that **ECHOLS** possessed on his December 21, 2021, arrest had no NIBIN leads. However, the firearm was purchased by Patrick Wood on October 6, 2021. Patrick Wood has not been interviewed by ATF at this time. The time between the purchase of the firearm and the date **ECHOLS** was in possession of the firearm was 76 days.

13. SA Williams also determined that **ECHOLS** was associated with other firearms involved in criminal activity in the Western District of Tennessee.

a. On June 29, 2022, Maurice WILSON was in possession of a Glock, Model: 23, Caliber: 40, pistol, Serial Number: BMHU256. MPD conducted a trace on the firearm and the original purchaser of the firearm showed to be Darryl Stewart. The Glock firearm was purchased

6

by Stewart on March 2, 2020. On September 20, 2022, SA Knox and MPD homicide conducted

an interview with Stewart. During the interview Stewart stated he purchased the Glock handgun

for **ECHOLS** and gave **ECHOLS** the firearm approximately month after the original purchase,

sometime in April or May 2020. SA Williams conducted a NIBIN investigation into the Glock

purchased by Stewart and determined the firearm was used in 5 NIBIN events between August 5,

2021, and June 8, 2022. Three of the NIBIN events were aggravated assaults, dated, August 5,

2021, September 6, 2021, and October 11, 2021. The other NIBIN events were December 25,

2021, and June 8, 2022; both were homicides. MPD Detective Suarez, who is assigned to the

Multi-Agency Gang Unit (MGU) assisted MPD Homicide in both death investigations. Based on

phone records received from state court orders, Det. Suarez observed a phone number associated

with **ECHOLS** communicating with Maurice WILSON on multiple occasions prior to the June

8, 2022, homicide.

     b.      On February 27, 2021, **ECHOLS** purchased a Diamond Back Arm Inc, Model:

DB15, Caliber: 556, pistol, Serial Number: DB2154284. The firearm was recovered during the

arrest of Terrance HOWARD on July 9, 2022. The firearm did not have NIBIN leads and was

not reported stolen at the time of recovery.

     c.      As of October 13, 2022, **ECHOLS** had one multiple sale report dates. On May 3,

2021, **ECHOLS** purchased a Taurus, Model: public defender judge, Caliber: 45, revolver, Serial

Number ACB602205 and a Glock, Model: 27, Caliber: 40, pistol, Serial Number: BTFA734.

**ECHOLS** was arrested in Miami, Florida on March 20, 2023, in possession of the Glock

firearm, 2 oxycodone pills and 1 hydrocodone pill.

     14.      On November 9, 2022, the Honorable Tu M. Pham, U.S. Chief Magistrate Judge

for the Western District of Tennessee, granted SA Williams a search warrant for historical cellular

phone locations for **ECHOLS'** cell phone number, **901-326-8869.** The search warrant was to determine if **ECHOLS'** cellular device was in the area of the associated NIBIN reports. Based on the results of search warrant, SA Williams determined **ECHOLS** was in the area of two of the NIBIN incidents.

      a.      The first NIBIN incident was an aggravated assault that occurred on October 11, 2021, at 20:35 hours, in the area of 2707 Carnes Ave, Memphis, Tennessee. During the incident, "Shot Spotter", a product to detect the sound of gunfire using audio capturing equipment to pinpoint the location of the gunfire, in the area alerted on 5 rounds being fired. When officers arrived, the recovered 3 spent .40 caliber shell casings at Carnes Ave and Buntyn Street. A short time later a victim, Antonio King arrived at an area hospital with a gunshot wound. King told police he was shot in the area of Carnes Ave and Buntyn Street. Based on the search warrant, **ECHOLS'** cellular phone was in the area around the time of this shooting.



      b.      The second NIBIN incident was a homicide that occurred on June 8, 2022, reported at 05:52 hours, at 4590 American Way, Memphis, Tennessee. Based on the search

warrant, **ECHOLS'** cellular phone was in the area where the homicide occurred but due to the nature of the homicide it is unknown when the victim was killed.



15.     On February 28, 2023, SA Williams and Knox conducted an interview with the original purchaser of the Glock, .40 caliber pistol, Christopher White. The Glock pistol was affixed with a machinegun conversion device when **ECHOLS** possessed it on September 28,

2021. White stated he sold the firearm to **ECHOLS** for $500 in the early months of 2022. However, based on the recovery of the firearm, White's timeline of sale is inaccurate.

16.     During the investigation, SA Williams was able to locate social media profiles that belonged to **ECHOLS. ECHOLS'** Facebook profile page, Joaquin Guzman with Facebook URL/Derrick.Echols.5 and **ECHOLS'** Instagram account, Djay_guzman. On March 10, 2023, the Honorable Annie T. Christoff, U.S. Magistrate Judge for the Western District of Tennessee, granted a federal search warrant for **ECHOLS'** Facebook and Instagram accounts.

17.     While waiting for the Facebook and Instagram search warrant results from Meta, SA Williams learned that **ECHOLS** was arrested in Miami, Florida on March 20, 2023, in possession of a Glock firearm, 2 oxycodone pills and 1 hydrocodone pill. The Glock firearm was registered to **ECHOLS** and was originally purchased in Memphis, Tennessee by **ECHOLS.**

18.     Based on **ECHOLS'** arrest with the firearm he purchased in Tennessee, SA Williams served subpoenas to all airlines that fly commercial from the Memphis International Airport on March 27, 2023.  Based on the records obtained from American Airlines, **ECHOLS** departed Memphis International Airport on March 16, 2023.  **ECHOLS** checked a bag into the flight; however, **ECHOLS** did not fill out any paperwork to declare a firearm. Based on Transportation Security Administration (TSA) rule, passengers are allowed to transport unloaded firearms in a locked, hard-sided, container as checked baggage only. The passenger must "declare" the firearm and/or ammunition to the airline when checking their bag. Based on the results of the subpoena, there was no document showing **ECHOLS** declared firearm or ammunition on this flight



*March 16, 2023 screen shot from airport.*

19.     SA Williams also received a subpoena return from Delta Airlines. A Delta

Airlines employee recognized a picture of **ECHOLS** and stated when **ECHOLS** flies, **ECHOLS**

checks in two empty suitcases. Delta Airlines records showed that **ECHOLS** utilized Delta

Airlines on the following dates to fly round trip from Memphis, Tennessee to Los Angeles,

California: August 10, 2022, September 12, 2022, December 29, 2022, February 1, 2023, and

March 1, 2023.  On each of these flights, **ECHOLS** returned back to Memphis on the last flight

of the day.  Based on SA Williams' training and experience working narcotics cases, drug

traffickers utilize suitcases to transport bulk narcotics. Furthermore, California is a source

destination for narcotics traffickers due to marijuana being legal in California, while marijuana is

illegal in Tennessee. Additionally, the quick round trip flight would allow **ECHOLS** to meet a

supplier and package the narcotics for transport. Lastly, by arriving on the last flight of the night,

**ECHOLS** knew that police presence in the late night and early morning hours is less busy;

therefore, the likelihood of being caught with narcotics lessens during the nighttime/early morning hours.

20.     In April of 2023, SA Williams received the Facebook and Instagram return for **ECHOLS'** accounts on each social media platform. During the review of **ECHOLS'** Instagram account, **ECHOLS** posted prices for different quantities of marijuana. SA Williams observed conversations between **ECHOLS** and other Instagram users inquiring about purchasing various amounts of narcotics from **ECHOLS.**

21.     November 26, 2022, Instagram direct message: based on SA Williams' training and experience, the term "QP" is slang for Quarter Pound. The term "ZA" is slang for high grade marijuana. Additionally, when **ECHOLS** gives the prices "600 for cuttie 11 hp," **ECHOLS** is stating the price of $ 600 dollars for a quarter pound of marijuana, $ 1100 for half-pound of marijuana.



22.     January 12, 2023 message: based on SA Williams' training and experience working narcotics investigations, **ECHOLS** sends a picture of the product available to suspected customers. The unknown customer responds asking for a "ZIP" of that "GP."  "ZIP" is slang for an ounce and "GP" is slang for the marijuana strand of Gary Payton.

12



23.     January 24, 2023 message: based on SA Williams' training and experience in firearms investigations, "Straps" is slang for Firearms. **ECHOLS** is telling the person in the message he does not have any firearms for sale right now.



24.     Februry 1, 2023 message: during this conversation between **ECHOLS** and zaepat, **ECHOLS** tells zeapat he is high when asked if he has ten left. Based on SA Williams' training and experience working narcotics investigations, and knowing **ECHOLS** sells prescription pills, zaepat is asking **ECHOLS** for some type of pill and **ECHOLS** says he only has a few left to sell because he got high off the rest.



25.     February 10, 2023 message: based on SA Williams' training and experience working narcotics investigaitons, the term "ZA" is slang for high grade marijuana. Additonally, when **ECHOLS** says "900 for half and 500 cutie" **ECHOLS** is saying the price for a half-pound of marijuana is $900 dollars and a quarter pound of marijuana is $500 dollars.



26.     February 14, 2023 message: based on SA Williams' training and experience working narcotics investigations, SA Williams knows "ZA" is slang for high grade marijuana,

"ZIP" is slang for ounce, and "G" is slang for grams. This conversation shows that **ECHOLS** sold two grams of marijuana.



27.     February 21, 2023 message: based on SA Williams' training and experience working narcotics investigations, and knowledge of **ECHOLS**' drug distribution, SA Williams knows "Pints" is slang for Promethazine with codeine. **ECHOLS** offers to sell a pint of the Promethazine with codeine for $115 dollars so he can make a $15 dollar profit due to **ECHOLS** paying $100 dollars for a pint from his source of supply.



28.     February 23, 2023 message: based on SA Williams' training and experience working narcotics investigations, **ECHOLS** is saying he only has a half-pound of marijuana and he offers to sell it for $700 dollars.



29.     February 26-27, 2023, message: based on SA Williams' training and experience working narcotics investigations, the term "GAS" is slang for marijuana. Here, **ECHOLS** is asked if he has marijuana to which **ECHOLS** responds that he does.



30.     Picture on **ECHOLS**' Instagram search warrant return (Unknown Date): Based on SA Williams' training and experience working narcotics investigations, **ECHOLS** is posting the prices for different quantities of marijauna. "Bow" is slang for a pound of marijuana, "Cutie" is slang for a quarter pound of marijuana, and "Juices" is slang for an ounce of marijuana.



31.     During the review of **ECHOLS'** Facebook search warrant return, SA Williams observed that **ECHOLS** communicated with other people on Facebook about shootings **ECHOLS** was at, people asking **ECHOLS** to sell firearms for them, and **ECHOLS** selling various narcotics.

32.     December 11, 2022 message: the message between **ECHOLS** and Facebook user Jwayy Fiftyfive, shows Jwayy Fiftyfive asking **ECHOLS** to find someone to purchase his firearm

for $1000 dollars. **ECHOLS** asks for a picture of the firearm in response.



33.     December 26, 2022 message: based on SA Williams' training and experience

working narcotics investigations, **ECHOLS** is selling 15 milligram percocet pills for $25 dollars.



34.     December 28-31, 2022 messages: based on SA Williams' training and experience, **ECHOLS** is engaging in the sale and purchase of firearms with Facebook user Jway Fiftyfive.



35.     December 30, 2022 message: based on SA Williams' training and experience working narcotics investigations, the term "Play" is slang for a narcotics transaction. Here,

**ECHOLS'** message states that **ECHOLS** must make 4 more narcotics transactions before he can meet up for their narcotics transaction.



36.     January 7, 2023 message: this message contains a photograph of a suitcase filled with packages of marijuana.  This date corresponds to **ECHOLS'** flight records received from Delta Airlines.  **ECHOLS** flew from Memphis, Tennessee to Los Angeles, California on January 6, 2023, and arrived back in Memphis, Tennessee from Los Angeles, California on January 6, 2023.



37.     January 13, 2023 message: based on SA Williams' training and experience working narcotics investigations, the buyer of marijauna in the picture above is asking **ECHOLS** for a quarter pound "QP" of marijauna for $500 dollars.



38.     January 24, 2023 message: based on SA Williams' training and experience

working narcotics investigations, **ECHOLS** is telling the buyer of marijuana that he can not get

any more marijuana from "Out West" but still has really good marijuana. **ECHOLS** goes on to

say the prices for the different strands of marijuana and sends a picture to the buyer of the

marijuana. SA Williams knows based on the investigaiton, **ECHOLS** flys to California to

purchase large qunatities of marijuana and transports the marijuana back to the Western District

of Tennessee to sell the marijuana.



39.     Based on SA Williams' training and experience working narcotics investigations, this photograph shows **ECHOLS** posting prices for different quantities of marijuana. "Juices" is slang for ounces, "Halves" is slang for half ounce, "Qtrz" is slang for quarter ounce. "1/4" is slang for one fourth of a pound of marijauna and "1/2" is slang for a half pound of marijuana.



40.     February 9, 2023 message: here, **ECHOLS** displayed a photo of two guns and calls the guns his twins.



41.     After reviewing the return of the above discussed social media warrants, SA Williams knew that **ECHOLS** frequently gave the address of **1298 S HIGHLAND STREET, TARGET PREMISE,** to his customers:

a.      On November 6, 2022, **ECHOLS** gave a Facebook user the address of **1298 S HIGHLAND STREET** as the location they can come to. The conversation prior to giving out the address is in relation to purchasing some "good shit."



b.      On November 19, 2022, **ECHOLS** gave a Facebook user the address of **1298 S HIGHLAND**.



c.      January 21, 2023 Message with Serena Hester: "Hester" asked **ECHOLS** for a "Half" and **ECHOLS** directed "Hester" to **1298 S. HIGHLAND** to make the purchase. Based on SA Williams training and experience working narcotics investigations and the totality of this investigation, **ECHOLS** sold "Hester" either a half ounce or a half pound of marijuana.



d.      On February 24, 2023, **ECHOLS** messaged a Facebook user the address of **1298 S HIGHLAND STREET**.



e.    On March 1, 2023, **ECHOLS** sent a Facebook message to a Facebook user directing them to **1298 S HIGHLAND**.



42.    On May 16, 2023, the Honorable Tu M. Pham, Chief Magistrate Judge in the Western District of Tennessee signed a cellular telephone "ping" search warrant for **ECHOLS'** cellular phone.

43.    On May 16, 2023, SA Williams began receiving the location data of the telephone pings. SA Williams reviewed the areas of Memphis, Tennessee that **ECHOLS** frequented the most, and continues to monitor the locations in which **ECHOLS** frequents.  Based on the ping data, SA Williams knew that the address of **1298 S HIGHLAND STREET, MEMPHIS, TENNESSEE** was inside the cellular ping radius.

44.    On May 24, 2023 at 9:30 PM, **ECHOLS** posted an Instagram live video that showed different strands of marijuana for sale.



45.     On May 24, 2023 at 9:32 PM, the cellular ping data placed **ECHOLS'** phone in the area of **1298 S HIGHLAND STREET, MEMPHIS, TENNESSEE**. Based on the timing of the "live" video and the cellular telephone ping data, SA Williams believes **ECHOLS** posted the video containing large quantities of marijuana from the location of **1298 S HIGHLAND STREET, MEMPHIS, TENNESSEE.**

46.     On May 26, 2023, at approximately 12:07 PM, **ECHOLS** posted an Instagram live video that listed various types of marijuana, including the Pink Runtz strain.



47.     On May 26, 2023 at 12:02 PM, **ECHOLS'** cellular telephone pings placed the cell phone in the area of **1298 S HIGHLAND STREET, MEMPHIS, TENNESSEE.** Based on the time of the Instagram live post and the time of the cellular phone ping, SA Williams believes ECHOLS was at **1298 S HIGHLAND STREET, MEMPHIS, TENNESSEE** when he posted the Instagram live video showing large amounts of marijuana for sale.

48.     On June 6, 2023, at approximately 3:20 PM, **ECHOLS** posted an Instagram live video showing the marijuana strand, Bubblegum.



49.     On June 6, 2023, **ECHOLS'** cellular telephone pings placed the cell phone in the area of **1298 S HIGHLAND STREET, MEMPHIS, TENNESSEE.**  Based on the time of the Instagram live post and the time of the cellular phone ping, SA Williams believes ECHOLS was at **1298 S HIGHLAND STREET, MEMPHIS, TENNESSEE** when he posted the Instagram live video showing large amounts of marijuana for sale.

50.     On June 8, 2023, at approximately 1:30 PM, **ECHOLS** posted an Instagram live video showing the marijuana strand, White Runtz.



51.     On June 8, 2023, **ECHOLS'** cellular telephone pings placed the cell phone in the area of **1298 S HIGHLAND STREET, MEMPHIS, TENNESSEE.**  Based on the time of the Instagram live post and the time of the cellular phone ping, SA Williams believes ECHOLS was at **1298 S HIGHLAND STREET, MEMPHIS, TENNESSEE** when he posted the Instagram live video showing large amounts of marijuana for sale.

52.     On May 25, 2023, SA Williams requested a Memphis Light, Gas, and Water check on 1298 S Highland Street, Memphis, Tennessee. Carlton King, **ECHOLS'** cousin, has active utilities at 1298 S Highland Street, Memphis, Tennessee. SA Williams knows of **ECHOLS** relation to Carlton King from an interview conducted on February 28, 2023, with Christopher White. Additionally, Carlton King is on Flight manifests with **ECHOLS** on a fight to California in August 2022. Which goes to show, **ECHOLS** and King are conspiring together to traffic marijuana from California to Memphis, Tennessee.

53.     Based upon the information above, a federal residential search warrant was issued by United States Magistrate Judge Annie T. Christoff in the Western District of Tennessee for 1298 S. Highland Street, Memphis, Tennessee on June 15, 2023.

54.     On June 21, 2023, ATF executed the residential search warrant for 1298 S. Highland Street, Memphis, Tennessee. As a result of the search warrant, ATF seized approximately 25 pounds of marijuana, three firearms, numerous rounds of ammunition.

55.     Based on the evidence recovered, a criminal complaint was filed.  The Honorable Charmiane C. Claxton, United States Magistrate Judge in the Western District of Tennessee, found probable cause that **ECHOLS** committed the offenses of: **18 U.S.C. § 922(g)(3), DRUG USER IN POSSESSION OF A FIREARM; 18 U.S.C. § 922(o), ILLEGAL POSSESSION OF A MACHINEGUN; 18 U.S.C. § 924(c) POSSESSION OF A FIREARM IN FURTHERANCE OF DRUG TRAFFICKING; and 21 U.S.C. § 841(A)(1), POSSESSION WITH INTENT TO DISTRIBUTE A CONTROLLED SUBSTANCE.**  The complaint is currently pending under case number 23CR-20115.

### **NEXUS FOR DERRICK ECHOLS' BLACK APPLE IPHONE**

56.     During the search of 1298 S. Highland Street, Memphis, Tennessee, Agents

located a **BLACK APPLE IPHONE (DEVICE 1)** on Derrick **ECHOLS'** person.



57.    SA Williams knew **ECHOLS'** cellular telephone number based on the facts

presented above and called **ECHOLS'** telephone number, 901-326-8869, from SA Williams

ATF issued cellular telephone to verify the ownership. When SA Williams called **ECHOLS'**

telephone number, the **BLACK APPLE IPHONE (DEVICE 1)** located on **ECHOLS'** person

began to ring. The phone number that showed on the screen of the **BLACK APPLE IPHONE**

**(DEVICE 1) was SA Williams' ATF issued telephone number.**



58.    Following the search of 1298 S. Highland Street, Memphis, Tennessee, Derrick

ECHOLS was transported to the Multi-Agency Gang Unit (MGU) where SA's Williams and

Jordan conducted an interview with Derrick **ECHOLS**.

59.     Prior to the interview with Derrick **ECHOLS**, SA Williams read **ECHOLS** his *Miranda* rights and Waiver. **ECHOLS** knowingly and voluntarily waived his rights and he agreed to speak with the agents. During the interview, **ECHOLS** admitted to being a chronic user of narcotics as well as a distributor of narcotics. **ECHOLS** stated persons would call his cell phone to order narcotics from **ECHOLS**.

60.     **ECHOLS** told agents that he has had different phones over time but keeps the same number even when he changes devices.

61.     Additionally, SA Williams knows based on training and experience, the "live videos" and pictures posted to **ECHOLS'** social media accounts have to be taken with a device capable of taking pictures, connected to the internet, and able to access social media account. The **BLACK APPLE IPHONE (DEVICE 1)** has all the necessary capabilities needed to post videos and pictures on social media.

62.     SA Williams knows that photographs and videos will be stored on the **BLACK APPLE IPHONE (DEVICE 1)** detailing **ECHOLS'** narcotics trafficking. Furthermore, based on social media messages obtained during the social media warrant, SA Williams knows photographs and videos of firearms will be stored on the **BLACK APPLE IPHONE**. Lastly, based on **ECHOLS'** own admission of persons contacting him via telephone to purchase narcotics, evidence of **ECHOLS'** narcotics trafficking will also be found on communication platforms (applications) located on the **BLACK APPLE IPHONE**.

### NEXUS FOR DERRICK ECHOLS' SILVER APPLE MACBOOK PRO LAPTOP

63.     During the federal search warrant executed at 1298 S. Highland Street, Memphis,

33

Tennessee a SILVER APPLE LAPTOP (Device 2) was located in Derrick **ECHOLS'** bedroom.



64.     Based on SA Williams training and experience, SA Williams knows that Apple devices mirror each other when they are linked to the same account. Based on the computer screen showing the computer user to be ECHOLS and the BLACK APPLE IPHONE **(DEVICE 1)** being an Apple product, SA Williams believes the account would be sync'd, therefore, the devices would house the same information.

65.     Additionally, based on **ECHOLS'** admission during the interview that he recently got a new phone because his prior cellular phone was seized by law enforcement during his arrest in Miami, Florida the computer would contain data not only from the **BLACK APPLE IPHONE (DEVICE 1)** seized during the search warrant but would also contain data from **ECHOLS'** prior cellular devices dating back to September 2021—the inception of this current investigation.

66.     The **APPLE MACBOOK PRO LAPTOP (DEVICE 2)** would act as a central repository for all cellular backups **ECHOLS** has done with different devices. Therefore, pictures, messages, emails, internet records would all be stored on the computer. Additionally,

payment information would be stored on this device. Payments for fights to California, rental

cars, electronic payments to purchase or payments received for narcotics could be housed on the

computer.

### NEXUS FOR THE DVR NIGHT OWL SECURITY SYSTEM, SERIAL NUMBER:YWV1U9U0HRBD

67.     During the federal residential search warrant at 1298 S. Highland Street,

Memphis, Tennessee agents located a **NIGHT OWL SECURITY SYSTEM, SERIAL**

**NUMBER:YWV1U9U0HRBD (DEVICE 3)**. The DVR was hooked up to cameras on the front

and rear of 1298 S. Highland Street, Memphis, Tennessee.



68.     During the interview with ECHOLS, ECHOLS stated multiple people come and

go from the residence. SA Williams believes evidence of narcotics trafficking would be stored

on the DVR system. Furthermore, SA Williams will use the video to identify witness and co-

conspirators in the narcotics distribution between Carlton KING and Derrick ECHOLS.

69.     It is the belief of SA Williams that evidence of violations of **18 U.S.C. §**

**922(g)(3), DRUG USER IN POSSESSION OF A FIREARM; 21 U.S.C. § 841(A)(1),**

**POSSESSION WITH INTENT TO DISTRIBUTE A CONTROLLED SUBSTANCE; and**

**18 U.S.C. § 924(c) POSSESSION OF A FIREARM DURING THE COMMISSION OF A DRUG FELONY**, will be located within the contents of Derrick **ECHOLS**' cellular phone. Additionally, SA Williams knows, based on his law enforcement training and experience, Apple devices mirror each other, and evidence of the same will be located on Derrick **ECHOLS'** Silver APPLE LAPTOP.

70.     Finally, based on admissions of **ECHOLS** during the Mirandized interview on June 21, 2023, the DVR system will contain footage of unknown persons, potentially co-conspirators, come and going from 1298 S. Highland Street, Memphis, Tennessee. Furthermore, the stored video inside the DVR system will show Derrick **ECHOLS**' narcotics trafficking and would also contain evidence of Carlton **KINGS'** narcotics trafficking from 1298 S. Highland Street, Memphis, Tennessee.

71.     The **DEVICES** are currently in the lawful possession of the **BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES ("ATF")**.  The **DEVICES** came into **ATF's** possession in the following way: seized during lawful arrest of Derrick **ECHOLS** and seized during the execution of the residential search warrant for 1298 S. Highland Street, Memphis, Tennessee.  Therefore, while **ATF** might already have all necessary authority to examine the **DEVICES,** I seek this additional warrant out of an abundance of caution to be certain that an examination of the **DEVICES** will comply with the Fourth Amendment and other applicable laws.

72.     The **DEVICES** are currently in storage at **2600 Thousand Oaks BLVD, Suite 2300, Memphis, TN 38118.**  In my training and experience, I know that the **DEVICES** have been stored in a manner in which its contents are, to the extent material to this investigation, in

substantially the same state as they were when the **DEVICES** first came into the possession of the **ATF.**

## TECHNICAL TERMS

73.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.     Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or

miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

        c.        Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

        d.        GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.      IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

74.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

75.      Based on my training, experience, and research, and from consulting the

manufacturer's advertisements and product technical specifications available online at

https://www.apple.com/ I know that **DEVICE 1 (BLACK IPHONE)** and **DEVICE 2 (SILVER**

**APPLE LAPTOP** both have capabilities that allow it to serve as "**a wireless telephone, digital**

**camera, portable media player, GPS navigation device, and PDA.**"  In my training and

experience, examining data stored on devices of this type can uncover, among other things,

evidence that reveals or suggests who possessed or used the device.

76.     Based on my training, experience, and research, and from consulting the

manufacturer's advertisements and product technical specifications available online at

https://nightowlsp.com I know that **DEVICE 3 ( DVR NIGHT OWL SECURITY SYSTEM)**

has capabilities that allow it to serve as "**digital camera and portable media player.**"  In my

training and experience, examining data stored on devices of this type can uncover, among other

things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

77.     Based on my knowledge, training, and experience, I know that electronic devices

can store information for long periods of time.  Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device.  This information can

sometimes be recovered with forensics tools.

78.      There is probable cause to believe that things that were once stored on the

**DEVICES** may still be stored there, for at least the following reasons:

a.      Based on my knowledge, training, and experience, I know that computer files or

remnants of such files can be recovered months or even years after they have been downloaded

onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a

storage medium can be stored for years at little or no cost.  Even when files have been deleted,

they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

79.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a

paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.       Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.       A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.       The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

80. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

81. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

82. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **DEVICES** described in Attachment A to seek the items described in Attachment B.

## REQUEST FOR SEALING

83. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have

learned that online criminals actively search for criminal affidavits and search warrants via the

internet and disseminate them to other online criminals as they deem appropriate, i.e., post them

publicly online through the carding forums.  Premature disclosure of the contents of this affidavit

and related documents may have a significant and negative impact on the continuing

investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

**KYLE WILLIAMS**
**SPECIAL AGENT**
**BUREAU OF ALCOHOL, TOBACCO, FIREARMS**
**AND EXPLOSIVES**

Pursuant to Federal Rule of Criminal Procedure 41(d)(3), the undersigned judicial officer has on this date considered information communicated by [ ] telephone or [  ] other reliable electronic means or [X] both, in reviewing and deciding whether to issue a search warrant.  In doing so, this judicial officer has placed the affiant under oath and has confirmed by speaking personally with the affiant on the telephone [X] that the signatures on the search warrant application and affidavit are those of the affiant or [ ] that the affiant has authorized the placement of the affiant's signatures on the application and affidavit, the documents received by the judicial officer are a correct and complete copy of the documents submitted by the affiant, and the information contained in the search warrant application and affidavit are true and correct to the best of the affiant's knowledge.

Sworn to and Subscribed before me on this 12TH day of July, 2023.

HONORABLE ANNIE T. CHRISTOFF
United States Magistrate Judge
Western District of Tennessee

44